Terrence BURNS, M.D., et al.   Plaintiffs,

v.

IMAGINE FILMS ENTERTAINMENT, INC., et al.   Defendants.

No. 92–CV–243S.

United States District Court,
W.D. New York.

Oct. 6, 2000.

Jeremiah J. McCarthy, Paul B. Zuydhoek, Buffalo, NY, for Plaintiffs/Petitioners.

Kenneth A. Africano, for Defendants/Respondents.

## DECISION AND ORDER

SKRETNY, District Judge.

### INTRODUCTION

Plaintiffs Terrence Burns M.D. and John Zoll claim that Defendants Imagine Films Entertainment ("Imagine"), Universal City Studios, Inc. ("Universal") and MCA, Inc. used Plaintiffs' copyrighted screenplays without permission in the film *Backdraft*. On June 17, 1998, this Court ordered that this action be terminated without prejudice and

**594**

that all outstanding claims be submitted to arbitration. (Item no. 284.)

On February 15, 2000, Plaintiffs filed a motion seeking leave to reopen this action and to vacate the decision of the arbitrators. (Item no. 300.) On March 10, 2000, Defendants cross-moved to reopen this action and to confirm the arbitrators' award. (Item no. 302.) Now, on review of the parties' submissions and on consideration of the issues presented therein and applicable law, the parties' cross-motions are granted, in that this Court reopens the present action. Further, Plaintiffs' Motion to Vacate the Arbitrators' Award is granted, and Defendants' Motion to Confirm the Arbitrators' Award is denied for the following reasons.[1]

### BACKGROUND

The factual and procedural background to this case has been set forth in the prior Decisions of this Court (*See* Items no. 211, 271, 284 and 298); and in the Reports and Recommendations and Decisions of Hon. Leslie G. Foschio, Magistrate Judge ("Judge Foschio") (*See* Items no. 32, 43, 56, 82, and 182–87.) The following facts are germane to the present motions.

### I. THE SCREENPLAYS AND SUBMISSION AGREEMENTS

Burns and Zoll had both worked as firemen for the Buffalo Fire Department. They wrote two screenplays based on their experience as firefighters, *Down to Gehenna* and *Baptism of Fire,* and registered copyrights for both plays. In June, 1988, they sent a copy of the *Gehenna* screenplay to Anthony Yerkovich. (Item no. 7 ¶¶ 10–13.) Yerkovich is a screenwriter who wrote regularly for the television series *Miami Vice,* and for other television shows and films. He states that he normally does not read unsolicited screenplays, but agreed to read Burns' and Zoll's work because he is a Buffalo native and his father knew Zoll's father. (Item 118, ex. 16 ¶¶ 5–7.)

As a precondition for reading the screenplay, Yerkovich required Burns and Zoll to sign a "submission agreement" that provided that any dispute over the value of the screen-

play would be "conclusively determined by a panel of three arbitrators" ("arbitration clause"). The submission agreement also provided that the value of the screenplay "may not exceed the minimum amount which would be payable for such material under the Writers Guild of America Basic Agreement" ("limitation of damages clause"); and that the authors' "sole right and remedy with regard to unauthorized use" of the screenplay "will be to submit the question of [its] value ... to arbitration." ("sole remedy clause") (Item no. 305, ex. A, at [5]-[14].)

Yerkovich read the *Gehenna* screenplay. Although he claims that the work was "unimpressive," he gave the authors some advice and encouragement. (Item no. 118, ex. 16 ¶¶ 8–9.) In late May or early June, 1989, Burns and Zoll sent Yerkovich a copy of the *Baptism of Fire* screenplay. (Item no. 7 ¶ 13.) They subsequently executed another submission agreement covering that screenplay, and sent the agreement to Yerkovich. The terms of the *Baptism of Fire* submission agreement are virtually identical to the terms of the agreement that covered the *Gehenna* screenplay. (Item 305, ex. A, at 1–3.) Yerkovich states that he does not recall whether he read the *Baptism of Fire* screenplay, but that an assistant, who read the screenplay at his request, was "unimpressed" with the work. (Item no. 118, ex. 16 ¶ 12.)

Despite his professed low regard for the authors' work, Yerkovich forwarded the *Baptism of Fire* screenplay to his agents, Creative Artists Agency (CAA), together with a cover letter suggesting that "there are a few good elements in" the screenplay. (*Id.* ¶¶ 12–13; Item no. 118, ex. 25, at [1].) A "reader" at CAA, who reviewed the screenplay concluded that "the authors have talent, but need a bit more seasoning before they'd be worthy of CAA representation." (Item no. 118, ex. 25, at 4.)

### II. BACKDRAFT

Gregory Widen had been a fireman in Laguna Beach, California before enrolling as a film student at UCLA in the early 1980's.

---

1. Plaintiffs' Motion also requests that this Court schedule a date for trial of their claims. (Item

300, at 6.) That request will be discussed at the next scheduled status conference.

He wrote the first draft of *Backdraft* as a student project and continued to revise the work after graduation. (Item no. 118, ex. 5 ¶¶ 2–3.) Trilogy Entertainment, a film production company, took an option on the story and then interested Delaurentiis Entertainment Group ("DEG") in the project. DEG hired Widen to rewrite the script. In 1987, DEG conveyed its interest in the project to Imagine. (*Id.* ¶¶ 1–3.)

Widen's 1987 drafts of the *Backdraft* screenplay focus on the investigation of a series of arson fires in which a victim is killed by a backdraft. The arsonist turns out to be a fireman. The story also involves a fireman killed in the line of duty, rivalry between two brothers, and a "rookie" fireman, who overcomes his initial fears and becomes a trusted member of the force. (Item 124, ex. C, D.) Ron Howard, then Executive Director of Imagine, states that he was intrigued by Widen's description of fire as though it was a character in the film. Howard states that he also liked the arson plot, but thought that the story should focus more on the brothers, and that the firemen's characters needed development. (Item no. 118, ex. 3, at 31–32, 131–32.)

Howard hired a succession of writers to work on the script; however, he was not satisfied with their revisions. He was about to postpone the project and direct *Cape Fear*, when he decided to let Widen rework the screenplay. Howard was sufficiently pleased with Widen's "72 hour rewrite" that he declined *Cape Fear* and made *Backdraft* as his next film. Widen continued to work on *Backdraft* until shooting was completed. (Item no. 118, ex. 1, at 181–89, 223–24; ex. 3, at 131–32, 175–80.)

### III. THE "OLIVERIO LETTERS"

In July, 1991, following the commercial release of *Backdraft*, Daniel Oliverio, an attorney retained by Burns and Zoll, wrote to Yerkovich, stating that his clients "were extremely surprised" at the "multitude of similarities and identities" between the film and their scripts, and had "discovered" that Howard asked Yerkovich to rewrite portions of the *Backdraft* screenplay. (Item no. 132, ex. I.) Referring to the submission agreements as a "letter agreement," Oliverio stated that his letter was

the written notice required under the terms of the alleged letter agreement signed by Mr. Zoll and Dr. Burns in May of 1988 and in July, 1989. Be advised, however, that the providing of notice thereunder shall in no way be construed ... [as] an admission by our clients of the validity and enforceability of the letter agreement and the remedies provided thereunder.

(*Id.*, at 2.) Oliverio stated that, if the matter were not promptly resolved, his clients would "commence an action in an appropriate forum" for copyright infringement. Copies of the letter were sent to Howard, Imagine and Universal. (*Id.*)

Yerkovich responded by writing directly to Burns and Zoll. He stated that he had nothing to do with *Backdraft*, and that he considered Oliverio's letter libelous and would sue if he did not receive an immediate apology. (Item no. 118, ex. 16F.)

Oliverio wrote back to apologize for mistakenly accusing Yerkovich of working on *Backdraft*. However, he reasserted his clients' belief that the film drew on their work product, and their intention to pursue the matter with the studios. (Item no. 132, ex. G.) Oliverio explained that he wrote the prior letter to insure that his "clients preserve their rights under the agreement with you," and that they were "extremely concerned about the document signed by them at your behest limiting liability and placing numerous restrictions upon remedies for any misappropriation of their work." (*Id.*, at 1.) He sent copies of the letter to Howard and to Universal. (*Id.*, at 2.)

Karen Green, Vice–President of Legal Affairs at Imagine, "directed" the studio's response to Oliverio. (Item no. 132, ex. J ¶ 4.) Green states that her decisions were "driven predominately by the threat of imminent litigation," which the studio "took quite seriously," even though they "believed the claims to be meritless." (*Id.* ¶¶ 3, 4.) In October, 1991, Green wrote to Oliverio, confirming that Yerkovich had nothing to do with *Backdraft*, and asserting that no one associated with *Backdraft* ever saw the Burns–Zoll screenplays. (Item 132, ex. H.)

Green's letter does not mention the submission agreements. However, Linda Joseph, Defendants' counsel, later acknowledged that her copies of the agreements "came from Karen Green ... who had obtained them from Mr. Yerkovich." (Item no. 136, at 11, n. 5.) It is reasonable to presume that Green obtained the agreements from Yerkovich in the course of investigating, and preparing the studio's response to Oliverio's letters. Green worked for Imagine until April 16, 1993 (Item no. 132, ex. J ¶ 1), and thus must have sent the agreements to Joseph prior to that date.

## IV. THE LAWSUIT, DISCOVERY, SANCTIONS

Burns and Zoll filed the Complaint in this case in April, 1992, and filed an Amended Complaint on October 6, 1992. (Items no. 1, 7.) Almost immediately, Defendants sought to prevent any discovery related to their profits from *Backdraft*.

On November 23, 1992, Defendants moved to defer discovery related to damages until three months prior to trial, or until resolution of the summary judgment motion that they planned to file. (Item no. 14.) Judge Foschio, who been assigned to supervise pre-trial motions and discovery (Item 5), denied the motion on August 10, 1993. He found that Defendants had not shown that discovery related to damages was likely to be burdensome, and that their assertion that they planned to move for summary judgment on liability was "not sufficient to establish the good cause necessary for granting a protective order." (Item no. 32, at 3–4.) Noting that, "absent an order bifurcating the discovery and trial of an action, discovery generally proceeds simultaneously on the issues of liability and damages," he ruled that discovery should proceed on both issues. (*Id.*, at 4, 5.)

On September 10, 1993, Defendants filed a motion requesting that trial on liability be bifurcated from trial on damages, and that discovery related to damages be stayed pending determination of liability. (Item 34.) Defendants contended that it was "quite clear" that Plaintiffs would not be able to prove that the creators of *Backdraft* had access to their screenplays, or prove that *Backdraft* was substantially similar to their works. (*Id.* ¶ 10.) Defendants also argued

that bifurcation furthered the interest of judicial economy since the issue of damages was "far more complex and time consuming than" the issue of liability. (*Id.* ¶¶ 13–14.)

Judge Foschio denied the bifurcation motion on March 21, 1994, stating that Defendants' submissions did not convince him "that summary judgment on the issue of liability is almost certain," (Item no. 43, at 6.) He noted that:

> [p]reparation for this trial will most likely involve travel to California to depose individuals there. Some witnesses may have information regarding both liability and damages. To require counsel to separate discovery and trial issues ... does not appear to this Court to further the principles of judicial economy and convenience.

(*Id.*, at 7.) Judge Foschio also noted that a number of the disputed financial documents included information that was relevant to Plaintiffs' copyright claim, including the identity of contributors to *Backdraft*. (*Id.*) He concluded that Defendants "will not be prejudiced by a single trial." (*Id.*) Judge Foschio also ordered Defendants to provide Plaintiffs with documentation of their expenses in making *Backdraft*, rejecting the argument such discovery was irrelevant and premature. (*Id.*, at 10–11.)

On March 22, 1994, the day after the Court denied their motion to bifurcate, Defendants moved for summary judgment on the issue of liability. (Items no. 44–45.) Defendants subsequently requested a stay of discovery pending resolution of their summary judgment motion. (*See*, Item no. 56, at 1.) Magistrate Judge Foschio issued a scheduling order for briefing of Defendants' request. However, he stressed:

> [w]hile the court will set forth a scheduling order for the filing of papers related to the request for a discovery stay, the court directs that Defendants comply with its previous two Orders, and further states that **Defendants' request for a stay of discovery will be deemed to pertain to future discovery only, and not to any previously ordered discovery by this court.**

(Item no. 56, at 2.) (Emphasis in original.)

By this point, Defendants' obligation to comply with this Court's discovery Orders

was unambiguously established. The Court had consistently rejected their arguments against financial disclosure, and ruled that discovery must proceed with regard to both liability and damages. (Items no. 32, 43, 56.) Yet, instead of providing the ordered documentation to Plaintiffs, Defendants' counsel sent a six page financial summary purporting to show that *Backdraft* did not make a profit. As Plaintiffs' counsel accurately noted, the six-page summary did "not come close to accounting for the expenses of production" of *Backdraft.* (Item no. 68 ¶ 9.) To justify Defendants' unilateral decision to disobey this Court's order, their counsel declared that:

> financial disclosure of the revenues and expense attributable to the motion picture . . . has absolutely no bearing whatsoever on the issues of access, copying or substantial similarity—the issues upon which defendants ask this Court to focus in the summary judgment action.

(Item no. 65 ¶ 6.) In other words, despite this Court's explicit rejection of Defendants' request that financial discovery be stayed pending resolution of their summary judgment motion, and the Court's Order directing that Defendants comply with pending discovery requests, Defendants unilaterally decided that they need not comply with the outstanding discovery Orders, since the discovery had, in their view, "no bearing" on their summary judgment motion!

In September, 1994, Plaintiffs moved for sanctions, contending that the six-page summary was unresponsive to their discovery requests, and was inaccurate and misleading. (Items 68–70.) Plaintiffs argued that the defendants'

> failure to abide by this Court's previous discovery orders is not inadvertent—rather it is deliberate. Defendants have already succeeded in impeding the progress of this action by their failure to produce information which this Court has repeatedly declared to be relevant. . . . [Therefore], defendants' flagrant disregard of this Court's discovery orders warrants the imposition of severe and meaningful sanctions.

(Item 69 ¶ 11.)

In a letter to Judge Foschio, dated October 18, 1994, Defendants' counsel averred that "raw cost information" was kept on microfilm chronologically, "not on a picture by picture basis," and that it would be difficult to segregate and retrieve the information specific to *Imagine.* Counsel stated that the information in the six-page summary came from computer runs, but that original "revenue documents" were "held at four different . . . locations in the United States . . . and at numerous foreign locations." (Item no. 79, ex. A, at 4.) Counsel suggested that Plaintiffs prioritize the types of documents that they wanted, and define a time frame for receiving them. (*Id.*) Given that this new proposal came two years after Plaintiffs' original request for financial information and more than one year after this Court's initial Order compelling discovery, it is not surprising that Plaintiffs rejected the proposal. (Item no. 79 ¶ 5.)

On December 21, 1994, Judge Foschio granted Plaintiffs' motion for a discovery sanction, ruling that the issue of Defendants' access to the Burns–Zoll screenplays was to be resolved in Plaintiffs' favor. (Item no. 83.) Judge Foschio stressed that the sanction did "not relieve Defendants of their obligation to produce the documents requested," and that further sanctions would be warranted, if Defendants failed to comply with then Court's discovery Orders. (*Id.,* at 14.)

Defendants promptly withdrew their summary judgment motion. (Item no. 81.) They subsequently moved for reconsideration of the sanction Order, contending that the Magistrate Judge had no authority to render a "dispositive" discovery sanction, and that the sanction was unduly harsh. (Item no. 87.)

Plaintiffs, meanwhile, compared the financial documentation that Defendants belatedly disclosed to data in the six-page summary. They concluded that *Backdraft* had not lost money, as asserted in the summary, but had actually made a significant profit. On June 5, 1995, Plaintiffs moved for additional discovery sanctions, seeking to strike the Defendants' Answers. (Items 128–29.) They argued: "not only have defendants failed to produce all documents within the scope of plaintiffs' requests, but the six-page summary which they produced in June, 1994 . . .

has been shown to be substantially inaccurate." (Item no. 129, at 12–13.)

One week later, on June 12, 1995, Defendants' counsel Linda Joseph, filed an affidavit stating that she had recently discovered "key documents" that significantly impacted her clients' potential liability. The "key documents" included the submission agreements. (Item 131 ¶¶ 1–2.) Defendants subsequently moved to amend their Answers, to include defenses based on the submission agreements (Items 137–38), and then moved to dismiss or to stay this action, pending arbitration. (Items 160–61.)

Defendants had not mentioned the submission agreements in any papers or at any appearance prior to Joseph's affidavit. Joseph blamed Plaintiffs for not providing the agreements in response to her document requests, stating that she learned of their existence during Yerkovich's deposition, when he described the Oliverio letters. (Item 131 ¶¶ 2, 8–10.) Joseph later admitted that she got the agreements from Karen Green, Vice President for Legal Affairs at Imagine. (Item no. 136, at 11 n. 5.) Although Green had directed the studio's response to Oliverio's letters, a matter that the studio took "very seriously," Joseph insisted that she did not initially appreciate the significance of the agreements. However, Joseph did not offer a credible explanation as to why a person in Green's position would fail to "flag" the importance of items that significantly impacted the studio's potential liability. (*Id.* ¶¶ 11–16.) [2]

Initially, Joseph insisted that she "discovered" the submission agreements on April 12, 1995. However, when Plaintiffs pointed out that she had not mentioned the agreements on June 2, 1995, when she requested oral argument on Defendants' summary judgment motion, Joseph stated that she had "discovered" the agreements subsequent to the June date. (Item no. 211, at 17.) Although this Court criticized Joseph's "glib" and inadequate explanation of this discrepancy (*Id.*), Defendants have never credibly explained why they failed to mention the agreements in

June, 1995, at a critical juncture in this litigation.

On February 16, 1996, Judge Foschio rendered four Decisions, and two Report and Recommendations. (Items no. 182–187.) Judge Foschio reaffirmed the prior discovery sanction, noting that Defendants did not produce financial documents requested by Plaintiffs until that sanction had been rendered, and that documentation eventually produced by Defendants "appears to provide evidence that the financial summaries provided to Plaintiffs in June of 1994 were not completely accurate if not outright misrepresentations." (Item no. 182, at 10, 15.)

Judge Foschio also recommended that this Court strike Defendants' Answers as an additional discovery sanction. "[R]eluctantly" concluding that "severe sanctions are now necessary" to "uphold the integrity of the court[ ]," he observed:

> [i]t is clear that, throughout the history of this case ... Defendants [have] attempted to confine the parameters of what they were required to produce by requesting protective orders, moving to bifurcate, or requesting a stay of discovery and, most significantly, by their unilateral interpretations of the necessary scope of the ordered discovery. Further, Defendants have demonstrated that the prior orders and lesser sanctions did not accomplish their purpose, as Defendants have persisted in their failure to fully comply with the orders of this court.

(Item 183, at 19.)

Judge Foschio also denied Defendants' Motion to Amend the Answers, finding:

> Defendants have waived the affirmative defenses they now seek to add to their answers, and the Plaintiffs would be prejudiced by Defendants' late interpolation of the Submission Agreements if they were permitted to form the bases of new defenses.

(Item no. 185, at 28.) He also held that, since Defendants denied that they "used" the Burns–Zoll screenplays, the agreements

---

**2.** That Green's letter to Oliverio did not mention the submission agreements is consistent with the studio's contention that no one connected with *Backdraft* saw the Burns–Zoll screenplays. However, that contention would not preclude Green from stressing the importance of the submission agreements to Imagine's trial counsel.

were not applicable. (*Id.*, at 9–10.) Judge Foschio also recommended that the Motion to Dismiss or Stay this action be denied, since it was premised on the proposed Amended Answers. (Item no. 196, at 3–4.)

Judge Foschio also denied Defendants' cross motion for sanctions, holding that plaintiffs had not improperly withheld the submission agreements since they were not responsive to Defendants document request. (Item no. 184, at 3, 5–7.)

Defendants filed objections to Judge Foschio's Decisions and Orders, and to his Reports and Recommendations (Items no. 197–98.) On June 5, 1996, this Court accepted the Recommendations and affirmed the Orders as they pertain to the present matter. (Item no. 211, at 2.)[3] This Court held that Defendants' failure to comply with Judge Foschio's orders compelling disclosure of financial documentation was "a deliberate disregard of the lawful orders of the court." (*Id.*, at 7, quoting *Cine Forty–Second St. Theatre v. Allied Artists*, 602 F.2d 1062, 1067 (2nd Cir.1979).)

This Court also upheld Judge Foschio's denial of Defendants' Motion to Amend confirming his finding that Defendants waived defenses under the submission agreements because of delay in asserting those defenses, and that the agreements were inapplicable, since Defendants denied using the materials (*Id.*, at 15–18.)

## V. APPEAL

Defendants appealed. (Item no. 218.) On March 6, 1997, the Second Circuit held that Defendants did not waive defenses based on the submission agreements, and did not have to admit that they "used" the Burns–Zoll screenplays in order to invoke the agreements. It therefore held that this Court erred in denying defendants' motion to amend the Answers. (Item no. 254, at 3–6.) Finding that the submission agreements do not provide for arbitration of the issue of liability, it ordered:

if and when the district court determines on remand that a judgment on the question of liability shall enter for plaintiffs, the court shall … direct[ ] that the question of damages shall be resolved pursuant to the terms of the Submission Agreement, either by the agreement of the parties or by arbitration.

(*Id.*, at 6.) The Second Circuit also observed that:

[t]he district court's sanction order, purporting to strike the defendants' answers was not a part of this appeal, and therefore was not directly or fully considered by this Court. Accordingly, in entering this Order, we intimate no view on the decision of the district court to strike the answers and we leave for another day any possible consideration of that question in any appeal that may be filed in the future.

(*Id.*)

## VI. ARBITRATION

On remand, this Court held that "the sanctions of striking the Defendants' Answers and denying leave to amend the Answers entitles Plaintiffs to have a judgment of liability entered in their favor." (Item no. 271, at 3.) This Court also found that the parties could not agree as to damages, and therefore, pursuant to the Second Circuit's mandate, ordered that damages be determined by arbitration. (*Id.*)

Plaintiffs then filed a motion seeking a jury trial on their claims. (Item no. 276.) On June 18, 1998, this Court denied Plaintiff's motion, holding that, "there is nothing in the Submission agreements which would indicate that some damages are to be resolved by arbitration and some within a federal forum." (Item no. 284, at 5.) This Court reiterated that its discovery sanctions "stand and are unaffected by the Second Circuit mandates." However, it declined to determine whether striking the Answers precluded Defendants from invoking the limitation of damages clause in the arbitration proceeding, holding that the issue must be presented to the arbitration panel. (*Id.*, at 7.) The action was then dismissed without prejudice. (Item no. 287.)

---

3. Judge Foschio also granted a discovery motion filed by Plaintiffs, on grounds unrelated to the present Decision. (Item no. 187.) This Court reversed a portion of that Order. (Item 211, at 2.)

Plaintiffs filed a Demand for Arbitration on July, 14, 1998. (Item 289, ex. A.) The arbitration panel rendered a preliminary Decision, holding that its authority:

extends to considering all of plaintiff's statutory and contractual claims, but is limited by the sole right and remedy clauses of the Submission Agreements to awarding damages "in the minimum amount which would be payable for the [materials at issue] under the Writers' Guild of America Basic Agreement..."

(Item no. 305, ex. J, at 5) (Ellipsis in original.)

The panel reasoned that "a requirement to resolve a dispute through arbitration can encompass without more all of plaintiff's claims for statutory remedies." *Id.*, citing *Mitsubishi Motors v. Soler Chrysler–Plymouth,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). However, a "limitation on the amount of damages ... [is] a matter of contractual interpretation for the arbitrators to decide." (*Id.*)

Arbitrator Singer dissented. He agreed that "arbitrators have authority to award all remedies under the Copyright Act." (*Id.*, dissent at 2.) However, he reasoned that the Federal Arbitration Act requires that "arbitrators must take the case as it currently exists in reaching their decision." (*Id.*, at 1.) Since this Court ordered that the Answers be stricken, he concluded that Defendants were precluded from raising the affirmative defense of limitation of damages. (*Id.*, at 2.)

Plaintiffs then moved to reopen this Action, contending that they complied with the requirement that they submit to arbitration. This Court denied the motion, holding that the panel had not yet rendered a decision on the merits of the case. (Item no. 299.)

Returning to arbitration, Burns and Zoll declined to submit evidence. (Item no. 300, ex. D.) On January 18, 2000, the panel rendered an award of "nothing," citing the absence of evidence on the value of the screenplays. (Item no. 300, ex. E.) Arbitrator Singer again dissented, based on his prior dissent. However, he agreed that, "if our authority is limited to awarding the reasonable value of plaintiffs' screenplays (not to exceed $54,000) then our final award should be zero." (*Id.*, at [2].)

Plaintiffs then moved to reopen this action and annul the arbitrators' award. (Item 300.) Defendants cross-moved, requesting that this Court confirm the determination, and "enter final judgment in the amount of zero dollars." (Item 302.)

## DISCUSSION

### I. THE PROPRIETY OF THE DISCOVERY SANCTIONS

■ A district court has broad discretion in fashioning a discovery sanction. It can order that facts are to be taken as established; preclude a party from supporting or opposing claims or defenses; prohibit a party from introducing evidence on particular matters and even strike pleadings. Fed.R.Civ.P. 37(b)(2)(A)-(C).

■ A sanction must be "just," Fed.R.Civ.P. 37(b), and there are constitutional limitations on a court's power to impose a dispositive discovery sanction, i.e. one that necessarily determines a claim against the offending party. As Justice Holmes observed, "great caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact." *McDonald v. Mabee,* 243 U.S. 90, 91, 37 S.Ct. 343, 343–44, 61 L.Ed. 608 (1917), quoted in *Insurance Corp. of Ireland v. Compagnie des Bauxites,* 456 U.S. 694, 701, 102 S.Ct. 2099, 2103, 72 L.Ed.2d 492 (1982). Consequently, a dispositive sanction should not be imposed because of a party's "inability, despite good faith efforts" to comply with a discovery order. *Soc. Internationale Pour Participations Industrialles et Commerciales v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255 (1958).

However, when a party adamantly refuses to obey valid discovery orders,

the most severe in the spectrum of sanctions ... must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

*National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 643, 96 S.Ct.

2778, 2781, 49 L.Ed.2d 747 (1976). Discovery sanctions serve three objectives.

First, they ensure that a party will not benefit from its own failure to comply. Second, they are specific deterrents and seek to obtain compliance with the particular order issued. Third, they are intended to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault.

*Update Art, Inc. v. Modiin Pub. Ltd.*, 843 F.2d at 67, 71 (2nd Cir.1988). "Fault" in this context can mean intentional disobedience or a failure to obey a discovery order due to a "gross negligence." *Cine Forty–Second St. Theatre*, 602 F.2d at 1064.

Although "extreme sanctions [should] be deployed only in rare situations" *id.*, the Second Circuit has upheld such sanctions when it was convinced that they were merited by the conduct of the disobedient parties. *Update Art*, at 69–71; *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853 (2nd Cir.1995) ("Defendants rolled the dice on the district court's tolerance for deliberate obstruction, and they lost"); *Penthouse International v. Playboy Enterprises, Inc.*, 663 F.2d 371, 390–91 (2nd Cir.1981). A severe sanction is particularly appropriate when a party made a strategic decision to disobey the court's orders, since such a sanction can influence "other parties to other lawsuits [who] would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts." *Update Art*, at 72, quoting *National Hockey League*, at 643, 96 S.Ct. at 2781.

This Court is convinced that the discovery sanctions that it has rendered are appropriate to the Defendants' conduct. Defendants refused to turn over considerable documentation with regard to one of the central issues in this case. They persisted in defying this Court's orders for more than a year, even after this Court rendered its initial sanction. Defendant made a strategic decision to disobey this Court's orders, to further their overall goals in this litigation. And, when that strategy of disregarding this Court's discovery orders ran its course, the evidence suggests that the summary data that Defendants provided was misleading, and possibly false.

Defendants' conduct and this Court's rationale for imposing sanctions has been summarized in prior Decisions. (*See* Items no. 83, 183, 211.) The following highlights are presented to demonstrate the essential underpinnings of this Court's decision.

Defendants were under a continuing obligation to provide discovery on income and expenses from *Backdraft*, as far back as March, 1994. (Item 43.) By that point, this Court had already rejected Defendants' motion for a protective order, and their motion to bifurcate this Action. When Defendants returned with a request to delay financial discovery in conjunction with their summary judgment motion, Judge Foschio held that the request was **"deemed to pertain to future discovery only and not to any previously ordered discovery."** (Item no. 56, at 2) (emphasis in original.)

Yet despite this Court's unambiguous orders, Defendants opted to send, *in lieu* of the required documentation, a six page summary that purported to show that *Backdraft* lost money. To justify their recalcitrance, Defendants' counsel asserted that financial disclosure "has absolutely no bearing" on their summary judgment motion. (Item no. 65 ¶ 6.) In other words, Defendants' counsel purported to unilaterally abrogate this Court's repeated insistence that discovery and pretrial preparation proceed with respect to both liability and damages (Items no. 32, 43, 56.)

To make matters worse, the data that Defendants belatedly provided in the six page summary, which concluded that *Backdraft* lost money, proved to be "not completely accurate, if not outright misrepresentations" (Item no. 182, at 15), in that the film apparently turned a rather healthy profit.

Defendants' strategy appears to have unfolded in three stages: (1) resist all financial disclosure, focus on the issue of liability (2) when financial disclosure cannot be stalled any longer, provide inaccurate and misleading information *in lieu* of the data requested by Plaintiffs; (3) when the inaccuracy of that information becomes evident, produce the submission agreements as a *deus ex machina*, limiting Defendants' financial exposure,

and rendering the disputes over discovery irrelevant.

Defendants maintain that they did not learn of the submission agreements, or at least did not appreciate the significance of the documents, until shortly before they brought them to the court's attention. In its decision on appeal, the Second Circuit reasoned that the agreements are "so clearly in defendants' interest that it is difficult to believe any other account of the matter." (Item no. 254, at 6.)

The terms of the submission agreements are certainly in Defendants' favor, and it is difficult to conceive of a reason why a defendant would not want to rely on them. However, the above chronology suggests a reason for delaying their express reliance on the agreements. Defendants' initial strategy was premised on the assertion that they were sure to win on liability. A lynchpin of that strategy was their repeated insistence that it was "quite clear" that they had no access to the Burns–Zoll screenplays. (Item no. 34 ¶ 10.) Had Defendants brought out the submission agreements early in the litigation, this issue may have seemed considerably less clear.

The agreements expressly apply to Burns, Zoll and Yerkovich. However, they also protect Yerkovich's "agents ... and representatives," (i.e. CAA, clients of CAA), and "any company with which [Yerkovich was] party to an agreement for the production or financing of motion pictures or television programs." (Item no. 305, ex. A, at 2, [5].) Once Defendants claimed that they were beneficiaries of the submission agreements, the question would necessarily arise: *how* are they beneficiaries? The answer to that question would necessarily implicate a "trail" from Yerkovich to Imagine and Universal, whether that "trail" led through CAA, or through some joint project between Yerkovich and those studios. Thus, early disclosure of the submission agreements may well have undermined Defendants early strategy of resisting financial disclosure, by insisting that they had no access to the screenplays.

■ The above explanation is not essential to the imposition of sanctions. Defendants were not sanctioned for failing to disclose the submission agreements. They were sanctioned for refusing to disclose financial information related to *Backdraft*. Their adamant refusal to do so, in the face of this Court's discovery Orders amply justifies the imposition of severe sanctions. In particular, this Court reiterates that the following sanctions were properly imposed. (1) Defendants are precluded from contesting the issue of their access to the Burns–Zoll screenplays. (2) The Answers are stricken. (3) Since the Answers are stricken, defendants are precluded from filing Amended Answers.

## II. THE EFFECT OF THE DISCOVERY SANCTIONS ON THE ARBITRATION AWARD

Fed.R.Civ.P. 37(b)(2)(B) provides that the court, as a discovery sanction, may render "[a]n order refusing to allow the disobedient party to support or oppose designated claims or defenses." Thus, this Court has authority to explicitly order that defendants are not allowed to raise defenses based on the submission agreements, provided that such an order is just. Fed.R.Civ.P. 37(b)(2).

This Court also has authority "to strike out pleadings or parts thereof," Fed.R.Civ.P. 37(b)(2)(C). This Court ordered that defendants' Answers be stricken. (Item no. 211.) As a necessary corollary to striking the Answers, this Court precluded Defendants from filing Amended Answers. (*Id.*) Although the Second Circuit held that this Court erred in ruling that defendants waived defenses based on the submission agreements (Item no. 254, at 5–6), it did *not* rule on the validity of the discovery sanctions, holding that that issue was not before the court. (*Id.*, at 6.) The question, then, is: what effect do the sanctions have on the arbitration award?

Fed.R.Civ.P. 8(c) provides that "arbitration and award" is an affirmative defense that must be pled in the answer. That Rule also requires that a Defendant affirmatively plead "any other matter constituting an avoidance or affirmative defense." (*Id.*) Limitation of damages is an affirmative defense that must be pled in the Answer. *Knapp Shoes v. Sylvania Shoe Manufacturing Corp.*, 15 F.3d 1222, 1226 (1st Cir.1994); *Simon v. United States*, 891 F.2d 1154, 1157 (5th Cir.1990).

■ Since Defendants' Answer has been stricken, and they are precluded from filing an Amended Answer, Defendants have not raised, and cannot raise the affirmative defenses of "arbitration and award" or "limitation of damages." Consequently, Defendants may not rely on the arbitration award, in defending against Plaintiffs' claims, and this Court must deny Defendants' motion to confirm that award.

This Court's ruling, that Defendants are precluded from raising "arbitration and award" or "limitation of damages," is consistent with the explicit language, and with the logic of the Second Circuit's Mandate. As mentioned above, the Second Circuit's review was limited to considering whether Defendants had intentionally relinquished their right to arbitrate (Item no. 254, at 5–6), and it declined to consider this Court's sanction Orders, or the impact of the sanctions on the issues before it. (*Id.*, at 6.)

This Court's ruling is not premised on a finding that defendants waived their defenses under the submission agreements, but rather on a finding that Defendants forfeited those defenses, by virtue of their disobedience of this Court's discovery orders, which led to the sanctions of striking the Answers and preclusion of the Amended Answers. There is a critical distinction between waiver and forfeiture of a defense. As the Second Circuit held, "[w]aiver is 'the intentional relinquishment of a known right,'" (Item no. 254, at 5, quoting *United States v. RePass*, 688 F.2d 154, 158 (2nd Cir.1982)). A party waives a right when it makes a conscious decision to give up that right. Forfeiture is an objective consequence of the party's conduct. For example, if a claim is barred by the statute of limitations, the party has forfeited its right to raise the claim by filing to timely bring it to court, even though that party never intentionally waived the claim.

In this case, Defendants' conduct, in refusing to obey this Court's discovery Orders had the objective consequence of forfeiting their affirmative defenses under the submission agreements. That consequence is imposed regardless of Defendants' subjective intentions. It is a necessary consequence of this Court's sanctions, which were imposed because of Defendants' conduct.

In his dissent to the Decision of the arbitrators on the Extent of Their Authority, Arbitrator Singer reasoned that "the arbitrators must take the case as it currently exists in reaching their decision." (Item no. 289, ex. D., dissent, at 1.) Arbitrator Singer explained the logical implication of that premise.

As of the commencement of this arbitration there have been rulings by Judge William M. Skretny in which he has struck the Answer of Defendants and refused to allow defendants leave to amend their Answers to include affirmative defenses. Accordingly, the current law of the case is that the defendants have no affirmative defenses at present in the arbitration as a result of the prior Court Order. It is not the role of the arbitrators to determine whether Judge Skretny was correct in striking the Answer and refusing to allow Defendants to assert affirmative defenses. . . .

Since the Submission Agreement contains a limitation of remedies as to reasonable value of the screenplay, as well as a limitation of damages . . . these defenses should have been raised as affirmative defenses by Defendants. . . . A provision limiting damages to a fixed sum constitutes an affirmative defense for purposes of Rule 8(c).

Because Defendants' Answer has been stricken, Defendants have not been allowed to raise the affirmative defense of limitation of damages. It is my dissenting opinion that Defendants have waived the limitation of remedy and limitation of damages defense. Since the sole remedy provision and limitation of damages should have been raised as affirmative defenses which are not part of the case, it is my opinion that the limitation of remedies and limitation of damages are not applicable to Plaintiff's claim. . . .

Accordingly, the arbitrators should not be limited by the sole remedy [or] the limitation of damages provision in the Submission agreement and should instead arbitrate the issue of damages and award Plaintiffs damages, profits and other remedies under the Copyright Act.

(*Id.*, at 2–3) (footnotes and internal citations omitted.)

This Court holds that Arbitrator Singer's analysis of the scope of the arbitration panel's authority, as quoted above, is correct,[4] and that the majority of the panel erred in holding that its authority was limited by the provisions of the submission agreements. Therefore, this Court grants Plaintiffs' motion to vacate the arbitration award, since the award is premised on the submission agreements.

This Court's vacating of the arbitrators' award does not compel the parties to return to arbitration. It is clear that further arbitration would be of no utility to the parties or to this Court. The only function of an arbitrators' award in the context of this lawsuit would be as a basis for Defendants to assert "arbitration and award" as an affirmative defense. Defendants are precluded by reason of this Court's sanctions, from raising that affirmative defense regardless of the outcome of arbitration.

These holdings are consistent with, and in furtherance of the Second Circuit's mandate. The Second Circuit required that this Court stay or dismiss this Action, once it found that Defendants were liable, so that the parties could submit the question of the value of the Burns–Zoll screenplays to arbitration. The Second Circuit did *not* rule that, at the conclusion of arbitration, this Court must adopt the finding of the arbitrators as the basis for its award of damages. Indeed, it expressly declined to address the propriety of this Court's sanctions. This Court's holdings that its sanctions are proper, and that the sanctions preclude defenses based on the submission agreements, are dispositive of the motions presently before this Court.

## III. THE EFFECT OF SANCTIONS ON THE DETERMINATION OF DAMAGES

This Court's holding that Defendants are precluded from asserting the limitation of damages clause in the submission agreements as an affirmative defense necessarily implies that Plaintiffs may seek damages un-der the Copyright Act, including an apportionment of the profits attributable to their work. A ruling as to the proper bases for calculating and contesting such damages is not essential to the outcome the motion, and beyond the scope of the present Decision. However, the parties' respective arguments on the procedural implications of the discovery sanctions suggest the need for clarification of one key point.

The Copyright Act provides:

The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required only to present proof of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements or profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).

■ This method of apportioning profits is defined by statute. Proof of deductible expenses, and proof that profits are attributed to factors other than the copyrighted work are inherent components in calculating the portion of profits, if any, that should be attributed to an infringed work. They are not affirmative defenses. Therefore, Defendants are *not* precluded from offering proof on these issues.

Although the statute puts the burden on Defendants to show that profits are attributable to their contributions, courts recognize the difficulty of quantifying the respective contributions of directors, producers, actors, screenwriters, set and costume designers, cinematographers, film editors and others to a film's profits; therefore, defendants are typically given considerable leeway in showing how those contributions contributed to a film's success. In the words of Judge Learned Hand:

---

**4.** Arbitrator Singer stated that this Court's sanctions "resulted in the *waiver* of" submission agreement defenses. It is clear from the context of this statement that Arbitrator Singer used the term "waiver" to express the concept of "forfeiture" as used in this Decision, at page 604. This difference in terminology in no way affects the validity of Arbitrator Singer's reasoning.

[w]e are aware that . . . it would be absurd to treat the estimates of the experts as being more than expressions of very decided opinions that the play should count for very little. But we are resolved to avoid the one certainly unjust course of giving the plaintiffs everything, because the defendants cannot with certainty compute their own share. . . . Procedural duties are devised in aid of truth; and their unsparing use may defeat their whole purpose, as here it would.

*Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 51 (2nd Cir.1939), *aff'd.* 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940). Holding defendants to an impossibly "scientific" standard on this issue would be contrary to the principles of the Copyright Act. *Id.*

There is no doubt that "the talent and popularity of the 'motion picture stars' generally constitutes the main drawing power of [a] picture," particularly where the film "is not identified with any well-known play or novel." *Sheldon*, 309 U.S. at 407, 60 S.Ct. at 687. Even if *Backdraft* had been taken word-for-word from the Burns–Zoll screenplays, Plaintiffs would have to prove their rightful portion of the profits. Defendants have presented compelling evidence that many, if not most of the elements in the final screenplay of *Backdraft* are attributable to sources other than Burns and Zoll. For example, Wider's 1987 screenplay predated Plaintiffs' submission of their work to Yerkovich; thus, it would be difficult if not impossible for Plaintiffs to claim credit for any elements of the 1987 screenplay. Also, Plaintiffs cannot take credit for *"scenes a faire,"* elements that "necessarily result from the choice of a setting or situation." *Walker v. Time Life Films*, 784 F.2d 44, 50 (2nd Cir.) cert. denied 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986)

The proper method for calculation of profits attributable to infringement, and the allotment of burdens of proof related to this issue are defined by the Copyright Act. Proof of deductible expenses and proof that profits are attributable to sources other than infringement are an embedded component of this statutory definition, and not affirmative defenses to Plaintiffs' claims.

This Court therefore holds that its discovery sanctions do not preclude Defendants from offering proof of deductible expenses and proof that profits are attributable to sources other than infringement.[5, 6]

### CONCLUSION

For the above stated reasons, Plaintiff's Motion and Defendants' Cross Motion to Reopen this Action is Granted.

FURTHER, Plaintiffs' Motion to Vacate the Arbitrators' Award is granted.

FURTHER, Defendants' Motion to Confirm the Arbitrators' Award is denied.

### ORDER

IT IS HEREBY ORDERED that Plaintiff's Motion and Defendants' Cross Motion to Reopen this Action is Granted.

FURTHER, that Plaintiffs' Motion to Vacate the Arbitrators' Award is granted.

FURTHER, that Defendants' Motion to Confirm the Arbitrators' Award is denied.

FURTHER, counsel for Plaintiffs and Defendants shall appear before this Court on Wednesday, November 1, 2000, at 11:00 a.m. in Part IV, United States Courthouse, 68 Court Street, Buffalo, New York for a status conference.

---

**5.** To the extent that *uncontradicted* evidence supports Defendants with regard to either deductible expenses, or their contribution to the profits, Defendants may, of course seek partial summary judgment or a partial directed verdict.

**6.** Clearly, the motions presently before this Court, and determined by this Decision, have a potentially dispositive impact. This Court notes that at an earlier stage of this case, Defendants applied for permission to file an interlocutory appeal. (Item no. 219.) That application was denied (Item no. 241.) It would not surprise this Court if one or both of the parties may again apply for permission to file an interlocutory appeal. While this Court cannot pre-judge such a motion, it would certainly give such a motion a careful, objective assessment, in light of the requirements of 28 U.S.C. § 1292.